FORREST CONSTRUCTION, INC. *v.*
John and Claudia MILAM, *et al.*

00-830                                          43 S.W.3d 140

Supreme Court of Arkansas
Opinion delivered May 17, 2001

4

*Phillip J. Taylor*, for appellant.

*Robertson, Beasley, Cowan & Ketcham, PLC*, by: *Kenneth W. Cowan*, for appellees.

W.H. "DUB" ARNOLD, Chief Justice. This appeal comes from a chancery decree enjoining appellant from subdividing certain lots and from selling certain lots that had already been subdivided in the Meadowbrook South Addition in the city of Greenwood. The chancellor also refused to enforce a sewer easement over land owned by appellees Donnie and Carol Whitson, and awarded appellees $23,579.65 in attorney fees. Appellant contends on appeal that the chancellor's rulings were erroneous; appellees ask that we dismiss the appeal on the grounds of mootness and lack of standing. We affirm the trial court as to the easement issue but reverse the trial court's interpretation of the restrictive covenants; as such, the court of appeals is affirmed in part and reversed in part.

The appeal was originally heard by the Arkansas Court of Appeals, which denied the motion to dismiss and reversed and remanded the case. *See Forrest Construction, Inc. v. Milam, et al.*, 70 Ark. App. 466, 20 S.W.3d 440 (2000). Appellees then petitioned this Court for review, asserting that the decision rendered by the court of appeals was arguably in conflict with prior holdings of this Court. We granted petition for review pursuant to Ark. Sup. Ct. R. 1-2(e)(ii). When we grant review following a decision by the court of appeals, we review the case as though it had been originally filed with this court. *Freeman v. Con-Agra Frozen Foods*, 344 Ark. 296, ___ S.W.3d ___ (2001); *White v. Georgia-Pacific Corp.*, 339 Ark. 474, 6 S.W.3d 98 (1999).

In 1993, Forrest Griffith and his wife Gloria acquired title to over 100 acres of land in Sebastian County. The land was later

annexed to the city of Greenwood. In 1994, Griffith began developing the majority of the land into a subdivision called Meadowbrook South. He planned to divide the property into thirty-nine lots. However, before he could plat the subdivision, he sold two tracts by metes and bounds description. One tract was sold to appellees John and Claudia Milam; the other was sold to Melissa and Nelson Brock. Thereafter, Griffith platted the subdivision into lots. On May 4, 1994, he filed a plat with the circuit clerk reflecting thirty-seven lots[1] ranging in size from 1.05 acres to 5.52 acres. The plat was signed by the Griffiths, Milams, and Brocks.

On May 9, 1994, five days after the plat was filed, Forrest Griffith filed a document containing ten restrictive covenants pertaining to the subdivision. The covenants provided, *inter alia*, that all lots were to be used for residential purposes only, that all residences were to have a minimum of 1,600 square feet of living area, and that all lots were to be used for single family dwellings. The document was signed only by Forrest Griffith.

After filing the plat and covenants, Griffith began to market the subdivision as one having estate-sized lots and offering "country living in the city." A few lots were sold in the summer of 1994 by Forrest and Gloria Griffith to various buyers, including appellees John and Claudia Milam and appellees Bill and Donna Dennis. In August 1994, the remaining property in the subdivision was transferred from the Griffiths to appellant Forrest Construction, Inc. After that time, the remaining appellees Maverick and Wendy Trozzi, Rush and Marcia West, Dean and Lena King, Rod and Sherry Hower, Ed and Andria Hawkins, Chris and Debra Honaker, Kenneth and Ann Hamilton, Donnie and Carol Whitson, and Charles and Kathryn O'Brien, purchased various lots in the subdivision.

In June 1996, Forrest Griffith, as president of Forrest Construction, Inc., decided to replat the subdivision by splitting nine of the unsold lots into twenty-two smaller lots. Lot 19 was split into eight lots approximately one-half acre in size, Lots 21 and 22 into three lots approximately three-quarters of an acre in size, Lots 31 and 32 into three lots approximately one and one-half acres in size, and Lots 34, 35, 36, and 37 into eight lots ranging in size from .63 acres to 1.2 acres. The Greenwood City Council approved the

---

[1] The lots were numbered one through thirty-nine, but the plat contained no lot twenty or twenty-nine.

replatting in September 1996. Thereafter, appellant began making improvements on the lots.

Griffith did not inform the appellee homeowners of his plan to split lots. However, they discovered his intention to do so; and, on February 18, 1997, a number of homeowners, including many of the appellees in this case, filed suit in Sebastian County Chancery Court to enjoin the splitting of lots. Within a few days thereafter, the Greenwood City Council withdrew its approval of the replatting. As a result, the homeowners voluntarily dismissed their chancery action without prejudice. Griffith, meanwhile, pursued judicial review of the city council's withdrawal of its approval. He ultimately obtained relief on May 8, 1998, when the Sebastian County Circuit Court found that the city council's withdrawal of approval had been wrongful.

Following the circuit court's ruling, Griffith began to sell the replatted lots. On August 19, 1998, appellees filed the suit that is the subject of this appeal. They alleged that appellant had split the lots in violation of the restrictive covenants filed in 1994, and they asked that appellant be enjoined from further violations. Appellant defended primarily on the grounds that none of the restrictive covenants expressly prohibited splitting the lots and that appellees' request for relief should be barred by the equitable doctrines of laches, waiver, estoppel, and unclean hands. The case went to trial, and the chancellor found that the restrictive covenant which stated that "all lots are to be used for single family dwellings" prohibited appellant from splitting the originally platted lots. He also found that there was no basis for the application of appellant's equitable defenses. Appellant was permanently restrained from any further splitting of the originally platted lots and from allowing any of the lots already split to be sold unless the lots already had substantial construction on them. It is from this ruling that appellant now appeals.

## I. Appellees' Motion to Dismiss

We must first address an issue originally presented by appellees in a motion to dismiss the appeal. The motion concerns events that occurred after the notice of appeal was filed in this case. On September 14, 1999, a decree of foreclosure was entered as the result of a complaint filed by Farmers Bank of Greenwood against appellant. The decree ordered the sale of certain secured property owned by appellant in order to repay over $1,000,000 owed to the bank.

Among the properties that had been pledged as security were Lot 23 in the Meadowbrook South subdivision and seventeen of the twenty-two split lots in the subdivision. On or about October 26, 1999, those lots were in fact sold to Farmers Bank. Appellees argue that, because of the foreclosure sale, the issues in this case are now moot, and appellant has no standing to prosecute this appeal. We disagree.

## A. Mootness

We have held that a case becomes moot when any judgment rendered would have no practical legal effect upon a then-existing legal controversy. *Dillon v. Twin City Bank*, 325 Ark. 309, 924 S.W.2d 802 (1996). As a general rule, an appellate court will not address moot issues. *Id.* However, we may elect to address moot issues when they raise considerations of public interest or when addressing them will prevent future litigation. *See Stair v. Phillips*, 315 Ark. 429, 867 S.W.2d 453 (1993).

Obviously, this case involves considerations of public inter-est in that the case involves the use of property in a large subdivi-sion, and the rights of a substantial number of persons will be affected. A ruling on the merits will have the practical legal effect of determining what actions may or may not be taken with respect to the subdivision lots. Additionally, although appellant has purport-edly filed a lawsuit in federal court against the City of Greenwood and the Whitson appellees and, according to him, that case has been stayed pending our resolution of this appeal, there is no evidence in the record as to foreclosure by any bank against Forrest Construc-tion nor of the federal lawsuit. As such, we deny the motion to dismiss on mootness grounds.

## B. Standing

The appellees further assert that appellant's appeal should be dismissed for lack of standing to prosecute this appeal. We have held that a party has no standing to raise an issue regarding property in which he has no interest. *Nash v. Estate of Swaffar*, 336 Ark. 235, 983 S.W.2d 942 (1999). However, we have also held that a party is an aggrieved party and thus has standing to appeal if the trial court's order has impaired his economic interests. *Sebastian Lake Pub. Util. Co. v. Sebastian Lake Realty*, 325 Ark. 85, 923 S.W.2d 860 (1996).

■ Even though appellant may have no present property inter-est in the lots that were replatted, he remains aggrieved by virtue of his liability for attorney fees in the amount of $23,579.65. The chancellor awarded those fees because he found that appellees were the prevailing party below. A reversal of that finding will necessarily entail a reversal of the attorney fee award against appellant. There-fore, we hold that appellant does have standing to prosecute the instant appeal.

## II. Merits of the Appeal

### A. Interpretation of Restrictive Covenant

■ Appellant raises several points of error regarding the chan-cellor's finding that the subdivision covenants prohibit the splitting of the originally platted lots. Chancery cases are reviewed *de novo* on appeal. *Holaday v. Fraker,* 323 Ark. 522, 915 S.W.2d 280 (1996). We do not reverse a chancellor's findings of fact unless they are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.*

The chancellor in this case found that the subdivision's general plan of development, the plat showing oversized lots, the marketing of the subdivision by appellant, and the covenant which read, "all lots are to be used for single family dwellings," prohibited the splitting of the subdivision's lots. We disagree and hold that the covenant was neither valid nor effective as executed.

■ Arkansas Code Annotated § 18-12-103 (1987) states:

> No restrictive or protective covenants affecting the use of real property nor any instrument purporting to restrict the use of real property shall be valid or effective against a subsequent purchaser or owner of real property unless the restrictive or protective covenants or instrument purporting to restrict the use of the real property is executed by the *owners* of the real property and recorded in the office of the recorder of the county in which the property is located.

(Emphasis added.) Here, only Forrest Griffith signed the restrictive covenants document, although he was not the sole owner. As such,

we hold that the covenants are not valid pursuant to Ark. Code Ann. § 18-12-103, as all of the parties did not sign the covenants.

██ ██ Notwithstanding, even if we had found the restrictive covenants to be valid, we do not find them to be prohibitive of lot-splitting in this case. We have held that we do not favor restrictions upon the use of land, and if there is a restriction on the land, it must be clearly apparent. *Holaday v. Fraker, supra.* Restrictive covenants are to be strictly construed against limitations on the free use of property. *Casebeer v. Beacon*, 248 Ark. 22, 449 S.W.2d 701 (1970). All doubts are resolved in favor of the unfettered use of land. *Id.* However, this rule of strict construction is limited by the basic doctrine of taking the plain meaning of the language employed. *Holaday v. Fraker, supra.* The general rule governing interpretation, application, and enforcement of restrictive covenants is that the intention of the parties as shown by the covenant governs. *Id.*

██ The covenant primarily at issue in this case, which is covenant number nine, provides simply that all lots are to be used for single-family dwellings. The court of appeals held, and we agree, that, as written, the covenant is directed more toward the type of *use* to which a lot is put rather than to the *size* of a lot. If there had been any intention to restrict the division of lots, such intention could have been clearly and unambiguously expressed in a covenant. *See Shermer v. Haynes*, 248 Ark. 255, 451 S.W.2d 445 (1970). There, in fact, was evidence at trial that, prior to the filing of the ten covenants that now govern the subdivision, a set of twelve covenants was drafted, one of which contained an *express* restriction on the splitting of lots. However, those covenants were not filed. The ten covenants filed, including covenant number nine, contain nothing to make it clearly apparent that the splitting of lots is prohibited.

██ In addition to basing his decision on the language contained in covenant number nine, the chancellor considered three additional factors: the size of the lots as originally platted, the fact that Griffith advertised the subdivision as having "estate-sized" lots, and the existence of a general plan of development. We hold that the chancellor was in error in finding that these factors impose a restriction against lot-splitting. First, it is generally recognized that no restriction on subdividing lots is implied by the mere filing of a map depicting the lots. *See* Milton Friedman, *Contracts and Conveyances of Real Property*, § 4.13(b) (4th ed. 1984). *See also* 20 Am. Jur. 2d *Covenants*, § 158 (2d ed. 1995); *Hickson v. Noroton Manor, Inc.*,

118 Conn. 180, 171 A. 31 (1934); *Bersos v. Cape George Colony Club*, 4 Wash. App. 663, 484 P.2d 485 (1971).

Second, the fact that the lots in the subdivision were marketed as being estate-sized does not, in and of itself, imply a restrictive covenant against splitting lots. Appellees cite us to no case, and our research has revealed none, in which the representations in an advertisement were used to create a restrictive covenant. In any event, the split lots were still sizeable, ranging from .5 to 1.2 acres.

Third, the fact that a general plan of development existed in the subdivision is, also, not evidence of a restrictive covenant against lot-splitting. The importance of a general plan of development is that, in its absence, a restrictive covenant cannot be enforced. *See Constant v. Hodges*, 292 Ark. 439, 730 S.W.2d 892 (1987). A general plan of development cannot *create* a restriction. *See Ray v. Miller*, 323 Ark. 578, 916 S.W.2d 117 (1996).

The chancellor relied upon the case of *Constant v. Hodges, supra,* in making his decision. While *Constant* has many similarities to the case at bar, it is distinguishable. In *Constant,* a property owner in the Robinwood subdivision in Little Rock wanted to divide his lot. The subdivision's restrictive covenants contained no express restriction against lot-splitting. Nevertheless, this Court held that lot-splitting was prohibited based upon the *existence* of a general plan of development but, more importantly, the language of all of the instruments and the intent gathered therefrom. Two of those instruments recited that "only one detached single-family residence . . . shall be erected." It is this language that distinguishes *Constant* from the case before us. It avails itself of the interpretation that property use is restricted to "only one" house per originally-platted lot. By contrast, the restriction in this case that "all lots are to be used for single family dwellings" is not susceptible to such an interpretation. Nothing in the latter language evidences an intent to prohibit the splitting of lots.

In short, we hold that the chancellor erred in his interpretation of the restrictive covenant. As such, we reverse his order enjoining the further splitting of lots and the sale of lots that are already split. Our holding necessitates that we also reverse the chancellor's attorney fee award to appellees because appellees are no

longer the prevailing party. *See* Ark. Code Ann. § 16-22-308 (Repl. 1999).[2]

## B. Easement

The next issue to be addressed concerns the chancellor's decision not to enforce a fifteen-foot sewer easement over the lot owned by appellees Donnie and Carol Whitson. The easement was sought by appellant in late 1996 for the purpose of connecting sewer lines to some of the split lots. Donnie Whitson (unaware that the sewer lines would service split lots, which he opposed) executed the easement in December 1996 in favor of the city of Greenwood. In conjunction therewith, he executed an agreement with appellant that, as compensation for the easement, appellant would clean up two ditches on the Whitsons' lot, clean out a creek on the lot, repair any ground disturbed by the laying of the sewer lines, and hook the Whitsons' house up to the sewer line at no charge. Both the easement and the agreement were signed by Donnie Whitson but not by his wife, Carol Whitson. In reliance on these instruments, appellant laid the sewer line across the Whitsons' property. According to Forrest Griffith, he was unaware that the easement might not be valid in the absence of Mrs. Whitson's signature.

Following the trial, the court initially declared that the city of Greenwood was granted an easement by estoppel across the Whitsons' lot. However, upon appellees' motion, he set that ruling aside on the ground that the city of Greenwood was not a party to the action and appellant was not the real party in interest with regard to whether the easement should be granted. Appellant contends that the chancellor's initial ruling should not have been set aside. We disagree and hold that the trial court should be affirmed on this issue.

Arkansas law provides that every action is to be prosecuted in the name of the real party in interest. Ark. R. Civ. P. 17(a). A real party in interest is considered to be the person or corporation who can discharge the claim on which the allegation is based, not necessarily the person ultimately entitled to the benefit of any recovery. *Smith v. National Cashflow Systems, Inc.*, 309 Ark.

---

[2] We need not reach the issue of whether attorney fees are recoverable under § 16-22-308 in an action for breach of a restrictive covenant.

101, 827 S.W.2d 146 (1992). Here, although appellant was a party to the easement agreement, the easement ran in favor of the City.

■ Further, although the Whitsons hooked into the sewer line and saw it being set, the record is clear that the Whitsons were opposed to lot-splitting and that they did not know that the sewer line was servicing split lots; moreover, as Mrs. Whitson refused to sign the easement agreement, it was neither valid nor enforceable. If the line had been servicing regular lots, the Whitsons would arguably be estopped from contesting the easement; however, because both Mr. *and* Mrs. Whitson, who did not sign, were opposed to lot-splitting, we hold that the easement cannot be enforced against them. Arkansas Code Annotated § 18-12-403 (Supp. 1999) states as follows:

> No conveyance, mortgage, or *other instrument* affecting the homestead of any married person shall be of any validity, except for taxes, laborers' and mechanics' liens, and purchase money, unless his or her spouse *joins* in the execution of the instrument, or conveys by separate document, and acknowledges it.

(Emphasis added.) As such, we affirm the trial court in regard to this issue.

Affirmed in part; reversed in part. Court of Appeals affirmed in part; reversed in part.